EDP:CWE
F. #2021R00708

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: A BLACK FORD FUSION, BEARING NEW YORK LICENSE PLATE NUMBER JPT6122 AND CONTAINERS THEREIN, AND ANY ELECTRONIC DEVICES FOUND THEREIN, CURRENTLY IN THE CUSTODY OF LAW ENFORCEMENT WITHIN THE EASTERN DISTRICT OF NEW YORK | **APPLICATION FOR A SEARCH WARRANT**<br><br>Case No. _____22-MJ-348_____ |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, RYAN SHIPLEY, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the vehicle particularly described as

a black Ford Fusion, bearing New York license plate number JPT6122 ("TARGET VEHICLE"),

that is currently within the custody of law enforcement within the Eastern District of New York,

further described in Attachment A, for the things described in Attachment B.

2.     I am a Special Agent with the United States Department of Homeland

Security, Homeland Security Investigations ("HSI") and have been since 2017. During my

tenure at HSI, I have been involved in the investigation of numerous cases involving narcotics distribution. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs and the efforts of persons involved in drug trafficking to avoid detection by law enforcement. I have also participated in the execution of various search warrants, including search warrants like the one sought herein. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C).

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## THE SUBJECT OFFENSES

2

5.      Based on the facts set forth in this affidavit, there is probable cause to

believe that violations of 21 U.S.C. §§ 841 and 846 (narcotics distribution and conspiracy) (the

"SUBJECT OFFENSES") have been committed, are being committed, and will be committed by

Edmond Perry who lives at 234 Sands Street, Apt. 8A, NY 11201.  There is also probable cause

to search the TARGET VEHICLE described in Attachment A for evidence of these crimes as

further described in Attachment B and evidence that will lead to the evidence of the commission

of the SUBJECT OFFENSES.

### PROBABLE CAUSE

6.      Between November 3, 2021 and February 8, 2022, an undercover New

York City Police Department ("NYPD") police officer ("UC-1") made seven controlled buys of

fentanyl from an individual subsequently identified as Edmond Perry, in an aggregate amount of

approximately 70 grams.  As described herein, Perry communicated with UC-1 from the number

(631) 336-1616.

7.      The NYPD Laboratory Controlled Substance Analysis Section ("NYPD

Lab") tested the parcels from each of the controlled buys.  All parcels that were tested from each

controlled buy contained fentanyl.

8.      On November 3, 2021, in connection with one of the controlled purchases,

UC-1 engaged in a narcotics-related text message conversation with Perry.  During the text

3

exchange, they agreed to meet in the parking lot of a McDonald's located at 59-60 55th Rd.,

Flushing, NY (the "McDonald's Lot"). Perry agreed to sell UC-1 five grams of heroin, a

controlled substance, in exchange for $325.

9.      Perry also indicated in a text message that he had to go to New Jersey after

the sale at the McDonald's Lot. UC-1 observed the TARGET VEHICLE park next to UC-1's

car in the McDonald's Lot. Perry stated in a call that he was in the TARGET VEHICLE in the

McDonald's Lot.

10.     Perry exited the TARGET VEHICLE and entered UC-1's undercover

vehicle on the passenger side. Perry appeared to be a Latino male who was wearing green

camouflage pants, black sneakers, a black hooded sweatshirt, a black facemask and a fitted

baseball hat. Perry proceeded to take a small parcel out of his pants pocket and hand it to UC-1.

In exchange, UC-1 handed $325 to Perry.

11.     Perry told UC-1 that his name is "Frank" and that he lives near

Woodhaven. He further explained to UC-1, in sum and substance, that he has a drug return

policy in which UC-1 would be able to bring back any narcotics products that were not good

enough quality and Perry would replace the product. Perry also told UC-1 that he had "light"

and "dark" heroin for sale. Perry then exited the undercover vehicle.

12.     On November 8, 2021, UC-1 and Perry engaged in another narcotics-

related text message communication during which they agreed to meet near the Woodhaven exit

17W on the Cross Island Parkway. They agreed to a transaction for "5 and 5" (referring to five grams of light heroin and five grams of dark heroin).

13.     On November 9, 2021, UC-1 received a call from Perry. The two discussed meeting in a parking lot located near Junction Boulevard and Horace Harding Expressway in Queens, NY (the "Junction-Horace Lot").

14.     In a later communication, Perry stated that he had arrived and directed UC-1 to park near the TARGET VEHICLE.

15.     After UC-1 arrived and parked, Perry exited the TARGET VEHICLE and entered UC-1's undercover vehicle. Perry was wearing a dark colored long-sleeved sweatshirt, dark pants, and a fitted baseball hat.

16.     After a brief discussion, Perry took two parcels from the pocket of his sweatshirt and handed them to UC-1. UC-1 provided Perry with $650. As indicated, though Perry claimed to be selling heroin, the substance in each of the three parcels was tested and revealed to contain Fentanyl.

17.     On December 2, 2021, UC-1 and Perry engaged in another narcotics-related text message communication during which they agreed to meet in the Junction-Horace Lot. They agreed to a transaction for five grams light heroin and five grams "NyQuil," referring

to a new heroin strain that Perry told UC-1 about during a telephone conversation earlier in the week.

18.     On December 2, 2021, UC-1 observed Perry park at the Junction-Horace Lot and exit the TARGET VEHICLE. Perry then entered UC-1's undercover vehicle. Perry was wearing a dark sweatshirt, dark pants and a fitted baseball hat.

19.     After brief discussion, Perry took two parcels from the pocket of his sweatshirt and handed them to UC-1. UC-1 provided Perry with $650. As indicated, though Perry claimed to be selling heroin, the substance in each of the two parcels was tested and revealed to contain Fentanyl.

20.     On January 7, 2022, UC-1 and Perry engaged in another narcotics-related text message communication during which they agreed to meet again at the Junction-Horace Lot. They agreed to a transaction for five grams light heroin and five grams dark heroin.

21.     On January 7, 2022, UC-1 observed Perry arrive, park and exit from the TARGET VEHICLE at the Horace-Junction Lot. Perry was wearing a dark sweatshirt, dark pants, a dark hat and a face mask.

22.     Perry then entered UC-1's undercover vehicle. After brief discussion, Perry took two parcels from the pocket of his sweatshirt and handed one parcel to UC-1. UC-1 provided Perry with $650. Perry told UC-1 that the second parcel he removed from his

6

sweatshirt pocket was intended for another buyer he was meeting later. As indicated, though Perry claimed to be selling heroin, the substance in the parcel was tested and revealed to contain Fentanyl.

23.     On January 25, 2022, UC-1 and Perry engaged in another narcotics-related text message communication during which they agreed to meet again at the Junction-Horace Lot. They agreed to a transaction for five grams light heroin and five grams dark heroin.

24.     On January 25, 2022, UC-1 observed Perry arrive, park and exit from the TARGET VEHICLE at the Horace-Junction Lot. Perry was wearing a dark sweatshirt, a dark hat and a face mask.

25.     After UC-1 arrived and parked, Perry entered UC-1's undercover vehicle. After brief discussion, Perry took one parcel from the pocket of his sweatshirt and handed them to UC-1. The parcel contained two separate parcels within. UC-1 provided Perry with $650. As indicated, though Perry claimed to be selling heroin, the substance in each of the parcels was tested and revealed to contain Fentanyl.

26.     On February 8, 2022, UC-1 and Perry engaged in another narcotics-related text message communication during which they agreed to meet again at the Junction-Horace Lot. They agreed to a transaction for five grams light heroin and five grams dark heroin.

27.     On February 8, 2022, UC-1 observed Perry arrive, park and exit from the TARGET VEHICLE at the Horace-Junction Lot.  Perry was wearing a dark sweatshirt, a dark hat and a face mask.

28.     After UC-1 arrived and parked, Perry entered UC-1's undercover vehicle. After brief discussion, Perry took one parcel from the pocket of his sweatshirt and handed them to UC-1.  The parcel contained two separate parcels within.  UC-1 provided Perry with $650.  As indicated, though Perry claimed to be selling heroin, the substance in each of the parcels was tested and revealed to contain Fentanyl.

## REQUEST TO SEARCH THE TARGET VEHICLE AND ITEMS TO BE SEIZED

29.     On February 23, 2022, the Honorable Robert M. Levy, United States Magistrate Judge for the Eastern District of New York, issued a tracking warrant (the "Tracker Warrant") for the TARGET VEHICLE, which allowed HSI special agents to track the TARGET VEHICLE's location.  See 22-MC-600.

30.     On March 21, 2022, the Honorable Taryn A. Merkl, United States Magistrate Judge for the Eastern District of New York, issued an arrest warrant (the "Arrest Warrant") for Perry.  See 22-MJ-332.  On March 22, 2022, Judge Merkl also issued a search warrant (the "Residential Warrant") for an address associated with Perry.  See 22-MJ-331.

31.     On March 22, 2022, UC-1 had arranged to meet Perry at the Junction-Horace Lot to purchase approximately 80 grams of heroin from Perry at approximately 5 p.m. When the UC-1 arrived at the Junction-Horace Lot, Perry got into UC-1's undercover vehicle but did not have any parcels of heroin with him.

32.     According to the Tracker Warrant, Perry arrived in the areas of the Junction-Horace Lot at around 4 p.m. and parked the TARGET VEHICLE around the corner from the Junction-Horace Lot, and then he later walked to meet UC-1 at the Junction-Horace Lot.  Soon after Perry entered UC-1's undercover vehicle, law enforcement arrested him pursuant to the Arrest Warrant.

33.     Law enforcement towed the TARGET VEHICLE and conducted a cursory safety search of it.

34.     On March 22, 2022, in connection with the arrest described above, law enforcement agents executed the Residential Warrant on the location associated with Perry.  The search did not reveal any evidence of the narcotics that Perry had distributed to UC-1 from the TARGET VEHICLE on the seven referenced occasions.

35.     Based on the above, there is probable cause to believe that Perry has drugs somewhere in the TARGET VEHICLE, including in a locked or hidden compartment within it. Based on my training and experience, I know that drug dealers often maintain trap or hidden compartments—such as locked and closed containers in areas in within their vehicles—to store

narcotics products while they are driving in order to avoid detection by law enforcement or others who may attempt to rob them.

36.    Based on my experience and training as a law enforcement officer, my conversations with other law enforcement officials, and my experience with this investigation, I believe that there is probable cause to believe that the TARGET VEHICLE will contain the property described in Attachment B.  Specifically, from the foregoing, I have learned, among other things, the following:

    a.  The selling of controlled substances involves various steps in a supply chain leading ultimately to the seller.

    b.  I have personally participated in the execution of search warrants and in a controlled delivery of narcotics.  Based on my experience and training, as well as conversations with other law enforcement officials, I am aware that, during the execution of those warrants, property of the type described in Attachment B, including but not limited to, packaging materials; scales; proceeds from narcotics transactions; electronic devices such as cell phones, tablets, and computers; and ledgers, logs or other documents reflecting such transactions and information regarding others involved in the narcotics trade; is frequently found.

    c.  Based on my experience and training, as well as my conversations with other law enforcement officials who have participated in controlled delivery operations

10

involving narcotics, I know that the items found in Attachment B have been found during the execution of search warrants on the locations involved in those operations and that, even where the location is not the ultimate point of sale, items that are indicative of narcotics trafficking, such as those listed in Attachment B, are frequently found inside including, but not limited to, packaging materials such as glassine bags or capsules; proceeds from sales; receipts from wire transfer services such as Western Union reflecting payments for shipments of drugs or other narcotics; electronic devices such as cell phones, tablets, and computers; receipts or delivery invoices showing the movement of packages through the location; and names or contact information for suppliers or others involved in the illegal trade of controlled substances.

d.  Members of drug organizations often maintain close at hand the addresses, telephone and pager numbers of their criminal associates, photographs of their associates, indicia of their membership in the drug organization, as well as information pertaining to their sources of supply and customers, in address books, electronic organizers and on other media, physical or electronic.  Telephone bills and records of calls to telephones and pagers are also maintained for lengthy periods of time in such homes.  Such records constitute important corroborative evidence in drug conspiracy cases because the defendants call one another

11

regularly, especially just before and after an incident involving an act committed in furtherance of the conspiracy.

## CONCLUSION

37.    Based on the foregoing, I respectfully submit that there is probable cause to believe that Perry is engaged in the SUBJECT OFFENSES and that evidence of this criminal activity will be found in the TARGET VEHICLE.

Respectfully submitted,

*Ryan Shipley*   3/23/2022

Ryan Shipley
Special Agent
HSI

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
March 23, 2022

HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

12

## ATTACHMENT A

*Property to be searched*

The property to be searched particularly is described as a black Ford Fusion, bearing New York license plate number JPT6122 ("TARGET VEHICLE") that is currently within the custody of law enforcement within the Eastern District of New York, for the things described in Attachment B.

## ATTACHMENT B

*Property to be seized*

1.     The items to be seized from the TARGET VEHICLE include the following evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841 and 846 (narcotics distribution and conspiracy) (the "SUBJECT OFFENSES"):

    a.   Quantities of narcotics and other controlled substances, including Fentanyl ("Controlled Substances").

    b.   Books and records including the names, addresses and telephone numbers of narcotics purchasers and suppliers, which books and records would reveal the identities of confederates in narcotics trafficking;

    c.   Books and records reflecting the delivery of shipments of, as well as sale of, or payment for Controlled Substances, including but not limited to receipts, invoices, or wire transfer service records;

    d.   Currency used to purchase Controlled Substances or which reflects the proceeds of sales of Controlled Substances;

    e.   Drug paraphernalia including glassine bags, capsules, scales, stamps, and cutting agents, including any documentation referring to such paraphernalia;

    f.   Weapons;

g.   Any evidence concerning any effort to evade law enforcement detection of the

SUBJECT OFFENSES; and

h.   Photographs, including still photographs, slides, negatives, digital images, videos,

films, or other items indicating Perry's engagement in the SUBJECT OFFENSES.